# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

DAVID WOOD, )
)
       Plaintiff, )
) CIVIL ACTION
v. )
) No. 14-2228-CM
LP CONVERSIONS, INC., )
TECH-SERVICES, INC., and )
JOSEPH DEVEN HURST, )
)
       Defendants. )
)

## MEMORANDUM AND ORDER

Plaintiff David Wood brings suit against defendants LP Conversions, Inc. ("LP Conversions"), Tech-Services, Inc. ("Tech-Services"), and Joseph Deven Hurst alleging (1) violation of the Kansas Securities Act, (2) fraudulent misrepresentation, (3) fraud by silence, (4) negligent misrepresentation, (5) breach of fiduciary duty, (6) breach of contract, and (7) conversion.[1] Defendant Tech-Services brings counterclaims against plaintiff for (1) breach of contract and (2) misappropriation of trade secrets. Defendants' Motion for Summary Judgment (Doc. 130) and Plaintiff's Motion for Summary Judgment (Doc. 128) are before the court.

## I. Facts

Unless otherwise noted, the following facts are either stipulated or construed in the light most favorable to the nonmovant.

---

[1] Plaintiff also originally brought suit against Roger Simons and brought a claim for accounting, but Simons has since been dismissed from the case and plaintiff did not include the accounting claim in the pretrial order. (*See* Docs. 104, 69.)

-1-

Plaintiff David Wood is a resident of Jackson County, Missouri. With his wife, plaintiff co-owns Magic Woods, Inc., a lawn and garden equipment retail store in Olathe, Kansas doing business as Smitty's Lawn and Garden Center.

Defendant LP Conversions is a Florida corporation with its principal place of business in Florida. As part of its business, LP Conversions sells and manufactures propane conversion kits for installation on outdoor power equipment.

Defendant Tech-Services is a Florida corporation with its principal place of business in Florida. It also helps to convert small engines to liquid propane use.

Defendant Joseph Deven Hurst is a resident of Florida. He is an officer, director, and shareholder of LP Conversions and Tech-Services. He is also the sole officer, director, and shareholder of Tech-Services.

Roger Simons is a resident of North Carolina. He is an officer, director, and shareholder of LP Conversions.

Starting in 2011, plaintiff became interested in converting gasoline engines for power equipment to liquid propane as something he could offer his customers.

In January of 2013, Magic Woods, Inc. doing business as Smitty's Lawn & Garden Center became a dealer for defendants' propane conversion kits during a training session conducted by Hurst in Kansas City. In July of 2013, plaintiff, Hurst, and Tom Diltz, general manager of Magic Woods doing business as Smitty's Lawn and Garden Center, had a conversation by telephone about investing in LP Conversions. To facilitate these discussions, plaintiff, as president of Magic Woods, signed a confidentiality agreement with Tech-Services. Plaintiff signed the confidentiality agreement as president of Magic Woods, not personally.

Plaintiff claims that Magic Woods entered into the agreement so that plaintiff could share information with his employees, not for investment purposes. Diltz testified that the confidentiality agreement was executed in that manner so that Mr. Diltz and other Magic Woods employees could "fall under its protection." Diltz and plaintiff discussed some aspects of the potential business, such as whether propane suppliers would stabilize gas prices, but Diltz testified that the discussions were not for the purpose of giving advice on whether plaintiff should invest in it.

In August 2013, plaintiff began to discuss investing in LP Conversions with Hurst and Simons. Plaintiff also discussed becoming a salaried employee of LP Conversions.

Around September 16, 2013, Hurst provided plaintiff with incorporation documents, bylaws, and organizational meeting notes for LP Conversions.

On September 20, 2013, plaintiff emailed Hurst and set forth the terms for his investment in LP Conversions, including among other things that (1) plaintiff would become a director of LP Conversions and (2) the parties would enter into an agreement protecting the stockholder from "being frozen out" of the action of the other stockholders. Plaintiff also suggested that the parties further define his position, and he suggested that he would handle the FerrellGas account and be accountable for the dealer channel, gas supply and infrastructure, and other duties.

On September 22, 2013, Hurst emailed plaintiff and told him that Hurst and Simons were "comfortable with what [plaintiff had] outlined." Hurst also noted that plaintiff should move forward with the agreement once his attorney completed it.

On September 24, 2013, Hurst countered with an email that showed what Hurst considered the terms which he believed the parties agreed to, including among other things: (1) plaintiff would receive a 5% interest in LP Conversions for every $250,000 invested and the same category of stock received for that investment as held by defendants Hurst and Simons; (2) plaintiff would work as

-3-

executive vice-president and executive marketing officer for LP Conversions; (3) Hurst, Simons, and Tech-Services would sign over certain rights regarding the use of equipment and sales opportunities; (4) establishing provisions of selling LP Conversions and dispersing its profits to stockholders; (5) providing plaintiff with a stock certificate or other evidence of the stock ownership he purchased; and (7) employing plaintiff as a salaried employee of LP Conversions.

Meanwhile, during this general timeframe, plaintiff hired an attorney to review the investment, draft documents, and provide specifics regarding the terms. Plaintiff also had some conversations with Reed Nixon, the president of a local bank. Plaintiff implied in emails that the banker reviewed the documents and analyzed the business for purposes of giving advice on whether to invest in it.

On September 25, 2013, plaintiff emailed Hurst and requested the same salary as Hurst and Simons. Later that day, Hurst emailed plaintiff and said they would start plaintiff's salary at $150,000, which was the same as Hurst's and Simons's salaries. Hurst and Simons were to take 50% of their salaries until the company reached positive cash flow. Then they would receive a one-time catch up payment and receive the full salary from that point forward. Hurst asked plaintiff whether he wanted his 50% salary before the company achieved positive cash flow, or whether he wanted the salary to accrue completely until the company reached positive cash flow. Plaintiff responded, "I will do exactly what you and [Simons] are doing for the number and the salary payments and expenses." Hurst responded with a revised agreement including plaintiff's salary and noted that they were "running out of hours to get this executed prior to [Hurst's] being in front of ONYX . . . . I/we just cannot afford to jeopardize our current agreement completely without at least some funding in place, I'm certain you understand."

On September 26, 2013, plaintiff wired an initial $250,000 to LP Conversions.

On October 3, 2013, plaintiff emailed Hurst to outline the parties' understandings based on a previous conversation. Plaintiff wrote that he would fund the balance of the $750,000 as soon as the operating agreement was finalized, with October 7 or 8 being the target date. On October 5, 2013, Hurst emailed plaintiff that any transaction must be completed before Hurst's meeting with Lampton Love, a potential investor. The meeting was to be held on Monday, October 7 at noon.

On October 6, 2013, plaintiff told Hurst that he would transfer the $750,000 to LP Conversions to complete his purchase of a 20% interest in the company. Later that day, Hurst attached a document which he said would be the operating agreement. He also stated that he "would engage our corporate attorney here in Florida and have him draw up with legalize [sic] exactly what we have agreed to and signed here." Plaintiff responded that they could discuss this when they would see each other on Monday night or Tuesday (October 7 or 8).

Plaintiff wired the remaining $750,000 on October 7 and 8, 2013, before a written shareholder agreement was signed by any party.

Plaintiff understood that the parties "had a living document that was being modified as time went on." Plaintiff funded the investment through funds from Magic Woods's line of credit to finance in part plaintiff's purchase of stock in LP Conversions, but the stock purchase was in plaintiff's name, not in the name of Magic Woods, and the funds did not come exclusively from accounts in the name of Magic Woods.

Hurst, Simons, and plaintiff are the sole shareholders of LP Conversions. Nobody other than plaintiff has paid cash to purchase shares of LP Conversions. Nobody has been issued a stock certificate for their ownership of shares in LP Conversions.

Before the formation of LP Conversions, Tech-Services had a written agreement with Onyx and Envirogard for the purchase of LP conversion kits, and to provide technical training to dealers.

After the formation of LP Conversions, LP Conversions did business under the name Tech-Services for the purchase and sale of conversion kits and providing technical training to dealers. The bank statements for LP Conversions identify the company as "LP Conversions, Inc. d/b/a Tech-Services, Inc."

Plaintiff was not formally appointed to a board position of LP Conversions, which defendants state is because he never signed a shareholder agreement. Defendants claim plaintiff had all of the practical responsibilities of a board member and officer.

In December 2013, Greenindustrypros.com published an article written by Gregg Wartgow, in which Gregg Wartgow interviewed plaintiff. Tech-Services claims that plaintiff disclosed confidential information during this in breach of the confidentiality agreement signed in July 2013.

Hurst and Simons both received a $75,000 per year salary from LP Conversions. Plaintiff never received a salary.

Plaintiff and Hurst continued to propose written agreements to each other, but they could not agree on the terms. During a telephone call, Hurst offered plaintiff on behalf of LP Conversions and Simons to pay plaintiff one million dollars from the profits of LP Conversions if plaintiff agreed to relinquish his 20% ownership interest. Later, by text message to plaintiff on March 16, 2014, Hurst stated the following:

> David, I'm going to meet with the accountant end [sic] of next week, we had to push it back because of our schedules, I'll have our books strait [sic], a P&L done and be able to let us all see a report. As far as the agreement, I have read it and responded without sending, I wanted to review with Roger [Simons] on Monday before we got to our meeting with the MAT manufacturer on Tueaday [sic] and Wednesday. You requested several things that we have previously addressed, the document I sent reflects exactly how the company is being run and will continue to be moving forward. I hope you will be comfortable with that. If not we will make you whole and continue to move ahead at the rapid pace we are, I'll be available tomorrow morning after 10 for a call as well[.]

By letter dated March 19, 2014, plaintiff purported to accept Hurst's offer to make him "whole." The letter stated as follows:

> To make me whole, direct $1,500,000 to me immediately (my $1,000,000 investment plus the additional $500,000 you offered me), plus interest at 4.75% from September, 2014 [sic] until paid. There is unpaid salary owed to me from October until paid at the same rate as [Hurst] and [Simons] have been paid. This amount was to behalf of the $150,000 yearly salary[,] $37,500 for the last 6 months. I expect to be reimbursed for my legal fees in the amount of $8,500 for the documents we prepared. I expect to spend another $2,500 with my lawyers in getting my repayment accomplished which I expect you to pay to make me whole.

Defendants state that plaintiff's letter requested more than what they agreed to on the phone.

As of the end of July 2014, Hurst owned 26% of LP Conversions, Simons owned 24% of LP Conversions, and plaintiff owned 20% of the stock of LP Conversions. The remaining stock was not owned. Defendants maintain that, pursuant to documents provided to plaintiff prior to the investment, if no additional stock was sold within one year, the remaining stock would be divided 60% to Hurst and 40% to Simons. Therefore, defendants maintain that Hurst currently owns 44%, Simons owns 36%, and plaintiff owns 20% of LP Conversions' stock. Neither Hurst nor Simons paid cash consideration for their majority share ownership in LP Conversions.

On April 28, 2014, plaintiff filed this lawsuit in Johnson County Kansas District Court, alleging claims against Hurst, Simons, LP Conversions, and Tech-Services. On May 19, 2014, defendants removed the case to this court. Plaintiff alleges that defendants induced him, through false representations and omissions of material fact, to purchase one million dollars of LP Conversion's shares. In exchange, defendants agreed that plaintiff would participate as an officer, director, and employee of LP Conversions. Plaintiff alleges that then he and defendants entered into a separate contract for defendants to make him whole by returning his one million dollar investment. Plaintiff argues he is entitled to this and additional damages arising from defendants' actions. Tech-Services brings a counterclaim against plaintiff, alleging that plaintiff violated the confidentiality agreement

between Magic Woods and Tech-Services and misappropriated Trade-Services' trade secrets. On September 17, 2015, plaintiff and Simons stipulated to dismissal of plaintiff's claims against him.

Plaintiff alleges that defendants have used his one million dollar investment for their own uses. Plaintiff points to evidence supporting that LP Conversions transferred funds to Tech-Services, which Hurst testified were for tuners for the propane conversion kits. Plaintiff states that he is personally aware that LP Conversions never purchased tuners. Furthermore, LP Conversions, Inc. doing business as Tech-Services, Inc. made a number of purchases, including car payments, other auto expenses, $14,306.75 spent for meals from October 2013 through December 2014, car parts, and $34,058.54 for tools. Hurst also spent money for fishing, entertainment, groceries and other similar items. There is an unexplained cash withdrawal of $86,180.00 in the account on October 17, 2014. Additionally, records for Tech-Services reflect $4,262.27 spent for meals, $449.59 spent for groceries, and $3,648.99 spent for racing car parts. There is a total of $48,902.50 in ATM and over-the-counter cash withdrawals from the account, and a total of more than $50,000 in unexplained withdrawals. Plaintiff alleges that Hurst and Simons have received almost $60,000 for travel and more than $14,000 for meals, as well as funds for clothing, fishing, groceries, racing car parts, and other unknown and unidentified expenses. Defendants allege that all of the expenses were properly made to third-parties for the purposes of developing and selling propane conversion kits. Defendants have lost money since September 2013.

## II. Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" factual dispute requires more than a mere scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, the nonmoving party may not rest on the pleadings but must set forth specific facts. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 252.

## III. Analysis

As previously noted, plaintiff brings seven claims against defendants: (1) violation of the Kansas Securities Act, (2) fraudulent misrepresentation and inducement, (3) fraud by silence, (4) negligent misrepresentation, (5) breach of fiduciary duty, (6) breach of contract, (7) conversion. Defendant Tech-Services brings counterclaims of (1) breach of contract and (2) misappropriation of trade secrets against plaintiff. The court first addresses plaintiff's standing and choice of law.

### A. Standing

Defendants argue that all of plaintiff's claims fail as a matter of law because plaintiff did not personally pay the investment at issue, but instead he directed payment from the accounts and a line of credit from companies that he and his wife co-own. In other words, defendants argue plaintiff lacks standing to sue in his personal capacity because he fails to make a direct claim for damages. Plaintiff argues that he has standing to bring his claims because the ownership interest in LP Conversions is in his name personally, not in the name or names of Magic Woods, Inc. and KC Custom Cabinet, Inc., the companies that provided funding. To have standing, plaintiff must allege a "personal injury fairly

-9-

traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007).

Here, the funding for the one million dollar investment came from four accounts: two accounts in the name of Magic Woods, Inc., one account in the name of KC Custom Cabinet, Inc., and payment from a line of credit in the name of Magic Woods, Inc. Plaintiff has presented evidence that the ownership interest in LP Conversions is in his name, not the name of the companies. Construing the facts in the light most reasonable to plaintiff, the court can reasonably infer that plaintiff, through his positions with Magic Woods, Inc. and KC Custom Cabinet, Inc., acquired funds to which he was personally entitled, which were supplied by the businesses' accounts and line of credit. Defendants present no evidence that plaintiff, as co-owner of both closely held corporations, lacked authority to direct the companies to distribute the funds to himself in his personal capacity. Furthermore, defendants provide no legal authority supporting that an investor cannot suffer personal harm if he acquires the investment money from some source other than his own personal bank account. Whether or not plaintiff properly directed the funds from these companies to fund the investment in his name is not before the court. Finally, plaintiff clearly claims a direct injury to the extent he alleges defendants wrongfully terminated his employment and withheld his salary. Therefore, plaintiff's claims do not fail as a matter of law for lack of standing.

### B. Choice of Law

The parties agreed in the pretrial order that Kansas law applies to most claims in this case. (*See* Doc. 69 at 2 ¶ 1.d.) Concerned that Kansas law did not properly govern all of the claims in this case, the court ordered additional briefing on the issue. (*See* Doc. 108.) The parties agreed that Kansas law applied to each claim, including the securities claim; therefore, the court applies Kansas law here.

### C. Plaintiff's Claims Against Defendants

#### 1. Violation of the Kansas Securities Act

Plaintiff claims defendants LP Conversions, Tech-Services, Inc., and Hurst violated the second clause of Kan. Stat. Ann. § 17-12a509(b), which creates liability for securities fraud where a party, to sell securities, makes "an untrue statement of a material fact or an omission to state a material fact necessary in order to make a statement made, in light of the circumstances under which it is made, not misleading . . . ." Plaintiff must show the following: (1) defendants made an untrue or misleading statement of material fact; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) defendants acted with intent to defraud or recklessness; (4) plaintiff relied on the misleading statements; and (5) plaintiff suffered damages as a result of his reliance. *See Simmons Invs., Inc. v. Conversational Computing Corp.*, No. 09-CV-2345 EFM/KMH, 2011 WL 673759, at *4 (D. Kan. Feb. 17, 2011) (applying elements of Section 10(b) of the Securities Exchange Act, which the court noted has the same elements as K.S.A. § 17-12a509(b)).

Plaintiff alleges Hurst made the following specific, false representations in order to induce him into purchasing LP Conversions stock: (1) plaintiff would become an officer of LP Conversions; (2) plaintiff would become a director of LP Conversions; (3) plaintiff would be an active employee and paid the same salary as defendants Hurst and Simons; and (4) plaintiff would receive protection for his minority shareholder status. (*See* Doc. 79 at 26.) Defendants argue that Hurst did not make any untrue statements of material fact.

Whether or not Hurst's statements were untrue or misleading statements of material fact, plaintiff has not presented any evidence supporting that Hurst intentionally or recklessly made the statements knowing they were untrue at the time. Because plaintiff's securities law claims against LP

Conversions and Tech-Services rely entirely on Hurst's statements, they also fail as a matter of law. The court grants defendants summary judgment on count one.

### 2. Fraudulent Misrepresentation & Inducement

Plaintiff relies on the same representations discussed above to support his claim of fraudulent misrepresentation and inducement. Defendants LP Conversions, Tech-Services, Inc., and Hurst argue that plaintiff's claim for fraudulent misrepresentation cannot survive summary judgment because the statements involve promised actions in the future.[2] Plaintiff argues that, under Kansas law, fraud must arise from false statement of existing and material fact, which may include the promise of future events. *See* Pattern Instructions for Kansas, PIK Civ. 4th §§ 127.40, 127.42. Defendants state that plaintiff failed to plead the promise of future events cause of action of fraudulent misrepresentation, and therefore should be barred from bringing the claim now. The court disagrees. Fraudulent misrepresentation by silence and fraudulent misrepresentation by promise of future events are specific instances of fraudulent misrepresentation, not entirely separate torts. Plaintiff included all of the facts upon which he relies in the amended complaint and pretrial order. Nonetheless, plaintiff's claim fails as a matter of law.

An actionable fraudulent representation "must relate to past or present fact, as opposed to mere opinions or puffing or promised actions in the future." *Ormsby v. Imhoff & Assocs., P.C.*, No. 14-2039-RDR, 2014 WL 4248264, at *6 (D. Kan. Aug. 27, 2014) (quoting *Timi v. Prescott State Bank*, 553 P.2d 315 (1976)). When the alleged fraud relates to promises or statements concerning future events, "the gravamen of such a claim is a fraudulent misrepresentation concerning a present, existing intention to perform when no such intention existed." *VinStickers, LLC v. Millernet Corp.*, No. 07-

---

[2] Plaintiff originally also brought claims for breach of fiduciary duty against Tech-Services, Inc. and Simons. The court dismissed the claim against Tech-Services (Doc. 47) and defendant Simons has been dismissed from the case on a stipulation of dismissal. (Doc. 105).

2031-JWL, 2008 WL 360578, at *3 (D. Kan. Feb. 8, 2008). The elements required to sustain a claim for fraudulent promise of future events are the following: (1) defendant had no intention of performing the promise at the time he made it; (2) defendant did not perform the promise as represented; (3) defendant made the promise with the intent to deceive and for the purpose of inducing plaintiff to act on the promise; (4) plaintiff reasonably relied and acted on the promise; and (5) plaintiff sustained damages relying on the promise. *Excel Laminates, Inc. v. Lear Corp.*, No. Civ. A. 01-2172-GTV, 2003 WL 22466192, at *6 (D. Kan. Oct. 28, 2003).

Plaintiff has not provided any evidence that defendants did not intend to honor their promises at the time they made the statements. Also, plaintiff has not provided any evidence that defendants made the promises with the intent to deceive or make plaintiff act on them. Therefore, plaintiff's claim fails as a matter of law. *See VinStickers, LLC*, 2008 WL 360578, at *3; *cf. Near v. Crivello*, 673 F. Supp. 2d 1265, 1277–78 (D. Kan. 2009) (stating that plaintiff's claim of fraud relating to promise of future events survived motion to dismiss because plaintiff alleged evidence of defendants' scheming to induce plaintiff into entering the agreement, conspiring to deprive plaintiff of his ownership interest, and planning to ruin the company in addition to misrepresentation and failure to adhere to promises). The court therefore grants summary judgment in favor of defendants on count two.

### 3. Fraud by Silence

Plaintiff brings a specific claim of fraud by silence against LP Conversions, Tech-Services, Inc., and Hurst. To establish fraud by silence under Kansas law, plaintiff must show the following elements: (1) defendants had knowledge of material facts that plaintiff did not and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) defendants were under an obligation to communicate the material facts to plaintiff; (3) defendants intentionally failed to communicate the material facts to plaintiff; (4) plaintiff justifiably relied on defendants to

-13-

communicate the material facts; and (5) plaintiff sustained damages as a result of defendants' failure to communicate the material facts to the buyer. *Stechschulte v. Jennings*, 298 P.3d 1083, 1097 (Kan. 2013); *see also* PIK Civ. 4th 142.41.

Plaintiff fails to identify any allegedly withheld statements of material facts. Therefore, plaintiff's claim fails under Kansas law. Therefore, the court grants summary judgment in favor of defendants on count three.

### 4. Negligent Misrepresentation

Plaintiff alleges defendants Hurst, LP Conversions, and Tech-Services negligently supplied false information for plaintiff's guidance in making his investment in LP Conversions. Although Kansas recognizes this cause of action, the Kansas Supreme Court distinguishes negligent misrepresentation from misrepresentation of intention to perform an agreement because allowing a "promise to perform to serve as the basis of a negligent misrepresentation claim" would mean that "any breach of contract claim action could be treated as also including a negligent misrepresentation claim." *Rinehart v. Morton Bldgs., Inc.*, 305 P.3d 622, 631 (Kan. 2013) (quoting *Gerhardt v. Harris*, 934 P.2d 976 (Kan. 1997)). Plaintiff's negligent misrepresentation claims are premised on the same statements that form the basis of his fraud claims, which are all promises to perform actions in the future. These fail as a matter of law under Kansas law. *Near*, 673 F. Supp. 2d at 1279. Therefore, the court grants summary judgment in favor of defendants on count four.

### 5. Breach of Fiduciary Duty

Plaintiff claims LP Conversions, Inc. and Hurst breached their fiduciary duties to plaintiff by suppressing his minority shareholder status and wrongfully terminating plaintiff's employment, compensating themselves excessively and not compensating him, and excluding plaintiff from

-14-

management.[3] Defendant argues that plaintiff's claim fails as a matter of law because it relies on Simon and Hurst colluding to mismanage LP Conversions' finances, and plaintiff fails to provide any evidence of collusion after the investment.

Under Kansas law, majority shareholders and directors acting together owe a fiduciary duty to a minority shareholder. *Herrmann v. Rain Link, Inc.*, No. 11-1123-RDR, 2014 WL 1641973, at *16 (D. Kan. Apr. 24, 2014). "A fiduciary generally must act with fairness and in good faith toward the person to whom the obligation is owed and may not convert opportunities or circumstances to his or her own financial advantage at the expense of that person." *See id.* (citing *Becker v. Knoll*, 239 P.3d 830, 834 (Kan. 2010) and *Goben v. Barry*, 676 P.2d 90, 98 (Kan. 1984)). Plaintiff can bring his claim as a direct action if the court finds that it will not (1) unfairly expose the corporation to multiple actions; (2) materially prejudice the interests of creditors in the corporation; or (3) interfere with a fair distribution of the recovery among all interested persons. *Richards v. Bryan*, 879 P.2d 638, 648 (Kan. Ct. App. 1994).

Plaintiff's claim fails as a matter of law because Hurst himself was not a majority shareholder, and plaintiff produces no evidence that Simons colluded with Hurst in suppressing plaintiff's minority shareholder status or mismanaging funds. All of plaintiff's claims of breach of fiduciary duty relate to Hurst's conduct after plaintiff invested in LP Conversions. Simons claims he never handled financial or corporate governance aspects of the company, and plaintiff points to no evidence suggesting otherwise. Therefore, plaintiff's breach of fiduciary duty claim fails under Kansas law, and the court grants defendants summary judgment on count five.

---

[3] The court dismissed plaintiff's breach of fiduciary claim against Tech-Services. (*See* Doc. 47.)

### 6. Breach of Contract

Plaintiff claims LP Conversions, Inc. and Hurst breached their contracts with plaintiff to "make plaintiff whole" and return plaintiff's investment.[4] Plaintiff alleges that the contract offer arose by a text message between plaintiff and Hurst, which stated:

> David, I'm going to meet with the accountant [at the] end of next week, we had to push it back because of our schedule, I'll have our books strait, [sic] a P&L done and be able to let us all see a report. As far as the agreement, I have read it and responded without sending, I wanted to review with Roger on Monday before we go to our meeting with the MAT manufacturer on Tueaday [sic] and Wednesday. You requested several things that we have previously addressed, the document I sent reflects exactly how the company is being run and will continue to be moving forward. I hope you will be comfortable with that. If not we will make you whole and continue to move ahead at the rapid pace we are, I'll be available tomorrow morning after 10 for a call as well[.]

(Doc. 72-5.) Plaintiff presents evidence that after Hurst sent this text, he and Hurst met on several occasions and Hurst continued to reference making plaintiff whole. Plaintiff sent a letter to Hurst purporting to accept LP Conversion's offer to make him whole. Plaintiff and defendants seek summary judgment on plaintiff's claim. The court lacks sufficient facts to grant summary judgment to either party regarding plaintiff's contract claim. Genuine issues of material fact exist regarding the existence of a contract to "make plaintiff whole," whether there was an offer, and whether there was an acceptance. Therefore, on this record, the court declines to grant summary judgment to either party on this claim.

### 7. Conversion

Plaintiff claims LP Conversions, Tech-Services, and Hurst tortiously converted his investment money and Hurst and Simons absconded with his funds by charging personal and improper expenses to LP Conversions and improperly paying themselves salaries instead of paying his salary. Defendants state that the expenses were legitimate business expenses and that paying Hurst's and Simons's salaries

---

[4] The court dismissed plaintiff's breach of contract claim against Tech-Services. (*See* Doc. 47.)

were within their rights, so there was no wrongful conversion. Defendants also argue that plaintiff cannot bring a conversion claim against LP Conversions because it cannot convert its own funds. Under Kansas law, "[c]onversion is the unauthorized assumption of the right of ownership over personal property belonging to another." *Geer v. Cox*, No. 01-2583-JAR, 2003 WL 22012622, at *3 (D. Kan. Aug. 20, 2003).

Currently pending before the court and set for hearing is plaintiff's motion for sanctions related to defendants' alleged continued failure to produce documents related to this claim. (*See* Doc. 112.) For now, the court finds it is premature to consider summary judgment on this claim and on this record. Therefore, the court denies defendants' motion for summary judgment on count seven.

### D. Defendant Tech-Services's Counterclaims for Breach of Contract and Misappropriation of Trade Secrets

Tech-Services ("counterclaimant" for purposes of this section) brings two counterclaims against plaintiff: (1) breach of contract and (2) misappropriation of trade secrets. Plaintiff seeks summary judgment on both claims.

#### 1. Tech-Services's Counterclaim for Breach of Contract

Counterclaimant alleges plaintiff breached the confidentiality agreement with Tech-Services. The counterclaim alleges that around "August 23, 2013, Magic Woods and David Wood . . . . executed a confidentiality agreement with Tech Services, Inc." (*See* Doc. 28 at 10 ¶ 5.) Counterclaimant requests damages against plaintiff for all proceeds plaintiff received for his alleged unauthorized competition and for the loss of business caused by plaintiff's alleged violation of the agreement. Counterclaimant also seeks recovery of its attorney fees and expenses incurred in enforcing the agreement. (Doc. 69 ¶¶ 4.c., 5.) Plaintiff seeks summary judgment, stating that he is not a party to the confidentiality agreement and he disclosed the confidential information with permission.

Counterclaimant does not dispute that plaintiff signed the confidentiality agreement as president of Magic Woods, Inc., DBA Smitty's Lawn and Garden Equipment, and not in plaintiff's personal capacity. Counterclaimant does not offer any alternative or equitable argument for how plaintiff could be bound by a contract entered into by Magic Woods, Inc., doing business as Smitty's Lawn and Garden Equipment. Counterclaimant argues that either plaintiff is the proper defendant for the counterclaim "or his entire petition must fail" because he is not the real party in interest. (Doc. 82 at 10.) The court disagrees. Magic Woods's entering into a confidentiality agreement with Tech-Services is not dispositive of whether plaintiff suffered personal damages from defendants' alleged breach of a separate contract, particularly given plaintiff's evidence that the investment is in his name personally. *Cf. Coker v. Siler*, 304 P.3d 689, 695–96 (Kan. Ct. App. 2013). Therefore, the court grants summary judgment to plaintiff on counterclaimant Tech-Services's breach of contract claim.

### 2. Tech-Services's Counterclaim for Misappropriation of Trade Secrets

Plaintiff states that counterclaimant cannot show certain damages sufficient to maintain his counterclaim for misappropriation of trade secrets. Neither party, however, provided an even brief analysis of what relief is available under the Kansas Uniform Trade Secret Act, which, assuming Kansas law applies here, presumably governs. *See* Kan. Stat. Ann. § 60-3326. Also, viewing the facts in the light most favorable to counterclaimant, genuine issues of material fact exist regarding whether Tech-Services consented to plaintiff's disclosure of the allegedly confidential material, which could be inconsistent with Tech-Services's reasonable efforts to maintain secrecy required under the Kansas Uniform Trade Secret Act. *See* Kan. Stat. Ann. § 60-3320(4)(ii). On this record, the court denies summary judgment to plaintiff on counterclaimant Tech-Services's counterclaim for misappropriation of trade secrets.

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment (Doc. 130) is hereby granted in part and denied in part. The court grants summary judgment to defendants on plaintiff's claims of (1) violation of the Kansas Securities Act (Count One), (2) fraudulent misrepresentation (Count Two), (3) negligent misrepresentation (Count Four), (4) fraud by silence (Count Three), and (5) breach of fiduciary duty (Count Five). The court denies defendants' motion for summary judgment on plaintiff's claims of (1) breach of contract (Count Six) and (2) conversion (Count Seven).

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 128) is hereby granted in part and denied in part. The court grants summary judgment to plaintiff on counterclaimant Tech-Services's counterclaim of breach of contract. The court denies plaintiff's motion for summary judgment as to his contract claim (Count Six) and counterclaimant Tech Services's counterclaim for misappropriation of trade secrets.

Dated this 22nd day of February, 2016 at Kansas City, Kansas.

                                           _s/ Carlos Murguia_
                                           **CARLOS MURGUIA**
                                           **United States District Judge**